UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | |
| | * | Criminal No.14-cr-10115-IT |
| YRVEN BAIN, a/k/a "E," | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

February 17, 2015

TALWANI, D.J.

I.      Introduction

On April 30, 2014, a federal grand jury indicted Defendant Yrven Bain for distribution of heroin in violation of 21 U.S.C. § 841(a)(1), possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1), and being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Bain now moves to suppress evidence seized during the execution of a search warrant. For the reasons discussed below, the court denies Bain's motion.

II.      Factual Background

a.  **Search Warrant Application**

In early 2014, law enforcement began an investigation of Bain for suspected drug-dealing activity. Pursuant to that investigation, officers applied for and were granted a search warrant for 131 Laurel Street, Apartment D in Malden, Massachusetts. The warrant application included an affidavit by Brian Connerney, a Task Force Agent with the Boston office of the United States Drug Enforcement Administration ("DEA") and fourteen-year veteran of the Arlington Police

Department. The affidavit provided the following information to establish probable cause:[1]

At the outset of the investigation, officers determined that Bain had three prior convictions for drug-trafficking offenses (including convictions in 2001, 2003, and 2007) and was on probation for his 2007 conviction. Officers further determined that Bain drove a brown Cadillac registered in his name at his mother's address at 32 Henderson Street in Arlington.

Officers worked with a confidential witness ("CW-1") to conduct two controlled purchases of heroin from Bain. The first controlled purchase took place on February 26, 2014, outside of an apartment complex at 685 Moody Street in Waltham. After CW-1 sent a text message to Bain's phone and was provided with $100 and a recording device, agents observed a man later identified as Bain exit the rear door of the apartment complex, get into CW-1's car, drive around the block, and exit the car. CW-1 turned in the purchased substance to officers. A subsequent analysis by the DEA determined the substance to be .80 grams of heroin mixed with fentanyl. Also on February 26, 2014, officers observed Bain's brown Cadillac parked in the parking lot of 685 Moody Street.

On March 1, 2014, Bain was charged in Waltham District Court with assault and battery for allegedly assaulting his brother at 685 Moody Street in Waltham. Bain's brother informed officers that Bain had been living with him at his 685 Moody Street apartment. Bain was held in custody until March 17, 2014. At the time of his release, Bain informed his probation officer that he would live at his mother's residence at 32 Henderson Street in Arlington. Agent Connerney states that "[s]ince his release, I have never seen Bain at his mother's residence, nor have I seen the Brown Cadillac parked there." Agent Connerney, however, does not indicate if

---

[1] Agent Connerney also attached to the search warrant affidavit an affidavit he had submitted in support of the application for a criminal complaint against Bain. Accordingly, the court draws facts from both affidavits.

and on what dates he conducted surveillance at the 32 Henderson Street address.

On March 21, 2014, four days after Bain's release, CW-1 sent a text message to Bain's phone to arrange another controlled buy. Bain arranged to meet CW-1 on Waite Street in Malden. CW-1 was again provided $100 and a recording device. While conducting surveillance of Waite Street, officers observed Bain walking from Church Street onto Waite Street. Officers then observed Bain enter CW-1's car, drive around the block, and exit the car. CW-1 turned in a substance that field-tested positive for the presence of heroin. This exchange took place within a few blocks of 131 Laurel Street in Malden—the location of the subsequent search.

After the controlled purchase on March 21, 2014, officers observed Bain's Cadillac parked near 131 Laurel Street at 2:35 p.m. on March 28, 2014, and at 12:30 a.m. on March 29, 2014. Officers also saw Bain enter the building at 131 Laurel Street on March 28, 2014.

On March 31, 2014, Agent Connerney applied for and obtained an arrest warrant for Bain. On April 1, 2014, at approximately 9:00 a.m., officers established surveillance of 131 Laurel Street and observed Bain's Cadillac parked nearby on Webster Street. Officers observed Bain exit the front door of 131 Laurel Street and walk towards his Cadillac. When officers approached to place Bain under arrest, Bain locked himself in his car and swallowed something. The officers then removed Bain from the car, placed him under arrest, and took him to the hospital because the officers believed what he swallowed to be drugs.

At the time of Bain's arrest, officers took a set of keys from Bain. Officers then went to 131 Laurel Street with the keys. Officers noted that there were four mailboxes outside the door to the building, and Bain's name was not on any of the mailboxes. Officers used the keys to open the front door to 131 Laurel Street. Officers then tested the keys in one door on the first floor and two doors on the second floor of the building. Officers determined that Bain's keys fit

the door to Apartment D.  There was no marking on the door of the apartment.  Officers then entered the apartment.  While walking through the apartment, officers observed in plain view a parking ticket issued for Bain's Cadillac, a safe being used as a television stand, and mail with an address of 131 Laurel Street, Apartment D.

Based on the above evidence, Agent Connerney stated his belief that, after Bain moved out of his brother's apartment, Bain was residing at 131 Laurel Street, Apartment D, and used the residence in connection with his drug-dealing activities.  Agent Connerney further opined that, based on his training and experience, individuals who distribute controlled substances typically maintain records, cash, and other evidence related to their drug trafficking where they reside.

### b.  *131 Laurel Street*

Based on the information contained in the Connerney Affidavit (and attached picture), the warrant, and the affidavit and pictures provided by defense counsel, the layout of 131 Laurel Street is as follows.  131 Laurel Street is "a two-and-a-half story home" with a hedge surrounding the front yard.  The front door is accessed by a set of stairs rising from the sidewalk running along Laurel Street.  On the exterior of the building, next to the front door, are four mailboxes and four buzzers.  The front door was locked on April 1, 2014, at the time of the officers' entry.  Inside the front door, the first floor contains the door to one apartment unit and the entry to a staircase, which makes two turns before arriving at a second-floor landing.  The second-floor landing contains the doors to two apartment units.[2]  The door to Apartment D is on the right-hand side and is located directly across from, and a few feet from the top of, the staircase.  The door to the neighboring unit appears to be one-to-two feet to the left of the door to

---

[2]  A fourth apartment unit is accessible through a separate entrance in the back of the building and is not accessible through the front entry.

Apartment D.[3]

### c. Execution of the Search Warrant

On April 1, 2014, a United States Magistrate Judge issued a warrant authorizing the search of 131 Laurel Street, Apartment D, for documents, records, and U.S. currency related to drug trafficking. That same day, officers executed the search warrant. Inside the apartment, officers found an electronic scale, a .45 caliber firearm and .45 caliber ammunition, heroin, pills, identification cards in Bain's name, cash, and a machine to press and manufacture credit cards.

III. Discussion

The affidavit in support of the search warrant explains that "[a]gents went to 131 Laurel Street in order to identify which apartment BAIN lived in." The affidavit then sets forth the steps the agents took to identify the apartment and the information they found:

> [1] Agents used the keys to open the front door to 131 Laurel Street. . . . [2] Agents then tried the keys in one door on the first floor and two doors on the second floor. Agents determined that the keys taken from BAIN fit the door to Apartment D. . . . [3] Agents entered the apartment . . . In plain view, agents observed mail with an address of 131 Laurel Street, Apartment D, Malden, Massachusetts. Agents also observed a parking ticket issued to the Brown Cadillac in plain view on a chair in a bedroom in the apartment.

In his motion, Bain contends that these steps constitute unlawful searches under the Fourth Amendment. Accordingly, Bain asserts that the information obtained through these searches must be excluded from consideration in determining whether there was probable cause to support

---

[3] The pictures of the second-floor landing provided by defense counsel depict items such as a set of drawers, a mat, shoes, and a decorative wreath. It appears, however, that the pictures were taken in January 2015, whereas the search in question took place in April 2014. Although defense counsel affirms that the tenant of Apartment D informed her "that there have been no significant changes to the layout of her building since the time of the search," Aff. of Counsel ¶ 3 [#70-1], counsel's affidavit does not indicate whether tenants stored personal items on the second-floor landing at the time of the search. Nor does the affidavit indicate whether there have been any changes in the landlord's policies regarding storage of personal items on the second-floor landing between April 2014 and January 2015. Accordingly, the court cannot make a finding as to the practices of the tenants or the policies of the landlord with regard to the storage of personal items on the second-floor landing at the time of the search.

issuance of the search warrant. Bain further contends that, whether or not the court considers the information obtained as a result of these searches, the warrant affidavit fails to establish probable cause to support issuance of the warrant. In response, the Government argues that: (1) Bain has not demonstrated standing to contest the search of Apartment D, (2) the officers' warrantless entry into 131 Laurel Street did not constitute a search, (3) the officers' warrantless entry into Apartment D was justified in order to maintain the status quo and prevent the destruction of evidence pending issuance of the warrant, (4) the subsequent search warrant was supported by probable cause, and (5) even if the warrant was not supported by probable cause, the officers' execution of the warrant falls within the good faith exception to the exclusionary rule. The court will address the parties' arguments, starting with the issue of standing, turning next to each of the steps taken by the officers after Bain's arrest to determine which apartment was the target apartment, and finally to the question of probable cause.

### a. Standing to Contest the Search of Apartment D

The Government contends that Bain has not proven that he resided, or otherwise harbored a reasonable expectation of privacy, in the apartment at 131 Laurel Street, Apartment D.

"To prevail on a claim that a search or seizure violated the Fourth Amendment, a defendant must show as a threshold matter that he had a legitimate expectation of privacy in the place or item searched." United States v. Battle, 637 F.3d 44, 48 (1st Cir. 2011) (citing Minnesota v. Olson, 495 U.S. 91, 95 (1990)). "While the Supreme Court noted that this threshold analysis is more properly placed within the purview of substantive Fourth Amendment law than within that of standing, courts continue to refer to it as an issue of standing." United States v. Lipscomb, 539 F.3d 32, 36 (1st Cir. 2008) (internal quotation marks and citations omitted). To cross this threshold, a defendant bears the burden to demonstrate that "he

personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88 (1998).

"[I]n some circumstances a person may have a legitimate expectation of privacy in the house of someone else." Id. at 89. For instance, an overnight guest has "an expectation of privacy in the home that society is prepared to recognize as reasonable." Olson, 495 U.S. at 96-97. Yet, not every guest "merely present with the consent of the householder" has a legitimate expectation of privacy in the home. Carter, 525 U.S. at 90; see United States v. Gray, 491 F.3d 138, 145 (4th Cir. 2007) ("[A] temporary visitor to a residence—perhaps the mailman or pizza deliverer—cannot generally claim the Fourth Amendment's protections.").

In the present case, Bain submitted an affidavit stating that the apartment belonged to his girlfriend, he often spent the night at the apartment, he spent the night at the apartment on the night prior to the search, he kept clothes and other personal belongings in the apartment, and he had his own set of keys to the apartment. See Bain Aff. ¶¶ 2-5 [#59-1]. The Connerney Affidavit corroborates several aspects of Bain's affidavit. Officers observed Bain entering and exiting 131 Laurel Street, observed Bain's brown Cadillac parked near the apartment "on several occasions" and "at all hours," and found keys to the apartment on Bain's person while searching him incident to arrest. See Connerney Aff. ¶¶ 12-16 [#36-2]. Based on the above evidence, the court finds that Bain has demonstrated that he was, at the least, an overnight guest and thus harbored a reasonable expectation of privacy in the apartment. See, e.g., United States v. Romain, 393 F.3d 63, 68 (1st Cir. 2004).

### b. *The Officers' Entry into 131 Laurel Street*

Bain asserts that "[t]he police first used the keys seized from Bain to open the front door of 131 Laurel Street" and that this entry itself "was a constitutional violation." Mot. Suppress 8

[#36] (citing United States v. Carriger, 541 F.2d 545, 550 (6th Cir. 1976) for the proposition that the "officer's entry into this locked apartment building without permission and without a warrant of any kind was an illegal entry and violated appellant's Fourth Amendment rights").  Under Katz v. United States, 389 U.S. 347, 360 (1967), a search takes place when the Government violates a person's "reasonable expectation of privacy."

First Circuit precedent establishes that generally "a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building."  United States v. Hawkins, 139 F.3d 29, 32 (1st Cir. 1998); see, e.g., id. at 33 (unenclosed common basement area of twelve-unit apartment building); United States v. Brown, 169 F.3d 89, 92 (1st Cir. 1999) (lobby of apartment building); United States v. Cruz-Pagan, 537 F.2d 554, 557-58 (1st Cir. 1976) (common garage of condominium complex); see also United States v. Werra, 638 F.3d 326, 331 (1st Cir. 2011) ("If the residence were comparable to a multi-unit apartment building, however, with distinct complete living spaces, Werra's privacy interest would not extend to common areas such as the foyer." (internal quotation marks and citation omitted)).  Whether to describe the area subject to search  "as 'common' is the heart of this matter," and accordingly, the court must normally "engage in what is necessarily a fact-specific inquiry, taking into consideration the nature of the searched location, and using [the First Circuit's] prior decisions for guidance."  United States v. Rheault, 561 F.3d 55, 59-61 & n.10 (1st Cir. 2009) (finding that Rheault, a second-floor tenant, did not have a reasonable expectation of privacy in a disabled washing machine on the third-floor landing, but noting that "[i]f the case had involved the second-floor landing, a different outcome might result").

Turning to the facts of the particular case at hand, the apartment house at 131 Laurel Street had three units accessible through the locked front door.  The small number of units and

locked exterior door suggest that the tenants in the building may have enjoyed a greater expectation of privacy in the interior of the building than would be the case in a larger building without a lock or where the mail and other deliveries were made inside the front door.

On the other hand, a number of considerations weigh against a finding that Bain had an objectively reasonable expectation of privacy in the interior of the building. The areas traversed by the officers—including the entryway, staircase, and second-floor landing—were shared spaces accessible to the tenants of three apartment units and their guests, the landlord, and the landlord's agents. See Rheault, 561 F.3d at 61 (reasoning that "a potentially revolving cast of third-floor tenants and their guests had relatively unfettered access to the very area in which Rheault claims an expectation of privacy"); United States v. Concepcion, 942 F.2d 1170, 1172 (7th Cir. 1991) (finding no reasonable expectation of privacy in hallway of six-unit building with a locked exterior door, reasoning that other tenants "used the space and could admit as many guests as they pleased"); United States v. Eisler, 567 F.2d 814, 816 (8th Cir. 1977) (reasoning that "[t]he locks on the doors to the entrances of the apartment complex were to provide security to the occupants, not privacy in common hallways" and that "[t]he common hallways . . . were available for the use of residents and their guests, the landlord and his agents, and others having legitimate reason to be on the premises"); United States v. Holland, 755 F.2d 253, 255-56 (2d Cir. 1985) (finding no reasonable expectation of privacy in locked vestibule of duplex, where "[i]n passing along the common ways . . . on any given day, . . . appellee reasonably might expect to meet the landlord or his agents, the occupants of the first floor apartment, deliverymen, tradesmen, or one or more visitors to the first floor apartment").

Moreover, the areas traversed by the officers served as passageways routinely used for egress and ingress to the apartment units. See Cruz-Pagan, 537 F.2d at 558 ("[A] person cannot

have a reasonable expectation of privacy . . . in such a well travelled common area of an apartment house or condominium."); see also Commonwealth v. Dora, 781 N.E.2d 62, 66 (Mass. App. Ct. 2003) ("It is well established that an individual can have only a very limited expectation of privacy with respect to an area used routinely by others." (internal quotation marks and citation omitted)).  Thus, Bain could not exclude others from or control access to these areas. Nor could Bain reasonably expect "that the goings-on in [these areas] would remain secret." Concepcion, 942 F.2d at 1172.

In light of the layout of 131 Laurel Street and the record, the court concludes that Bain has not demonstrated that he had a reasonable expectation of privacy in the areas traversed by the officers in this case.  Accordingly, Bain has not demonstrated that the officers' entry into 131 Laurel Street constituted an unlawful search in violation of his Fourth Amendment rights.

### c. The Officers' Acts of Standing at the Threshold of the Door to Apartment D and Turning the Key in the Lock

Bain next contends that in standing before the door to Apartment D and turning the key in the lock, the officers engaged in an unconstitutional search under Jardines and Jones.

 In Jardines and Jones, the Supreme Court recently confirmed that the Katz formulation is not the only test for determining whether a search has taken place under the Fourth Amendment. Rather, a search also takes place when the Government obtains information through an unlicensed physical intrusion on a constitutionally protected area, such as the home or its curtilage.  See Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) ("When 'the Government obtains information by physically intruding' on persons, houses, papers, of effects, 'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" (quoting United States v. Jones, 132 S. Ct. 945, 950-51 n.3 (2012))); Jones, 132 S. Ct. at 952 ("[T]he Katz reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law

trespassory test.").  Bain asserts that the officers engaged in an unlicensed physical intrusion under Jardines when they approached the door to Apartment D and tested Bain's keys in the lock.

In Jardines, the Supreme Court held that officers' use of trained police dogs to sniff the front porch of a house constituted a search for the purposes of the Fourth Amendment.  Jardines, 131 S. Ct. at 1417-18.  The Court reasoned that the porch fell within the curtilage of the home, and the officers' entry into the curtilage exceeded the implied license to approach the front door for the limited purpose of knocking.  Id. at 1415-17.  Thus, the Court concluded that the officers' actions constituted an unlicensed physical intrusion on a constitutionally protected area (the curtilage of the home) under the Fourth Amendment.  Id.

Similarly here, if the area at the threshold of the door to Apartment D falls within the curtilage of the home or if the doorknob constitutes part of the home itself, then the officers' acts of approaching the door to test the lock, as well as inserting the key into the lock, would constitute an unlicensed physical intrusion on a constitutionally protected area.  Accordingly, the court must determine whether the area surrounding the door to Apartment D falls within the curtilage of the home or whether the doorknob should be considered part of the home itself.

The Supreme Court has described "curtilage" as "the area immediately surrounding and associated with the home," "to which the activity of home life extends."  Oliver v. United States, 466 U.S. 170, 180, 182 n.12 (1984).  "This area around the home is intimately linked to the home, both physically and psychologically," and thus is regarded as "part of the home itself for Fourth Amendment purposes."  Jardines, 133 S. Ct. at 1415, 1414 (internal quotation marks and citations omitted).  The Supreme Court has articulated four factors for determining whether an area constitutes curtilage: "[1] the proximity of the area claimed to be curtilage to the home, [2]

whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." United States v. Dunn, 480 U.S. 294, 301 (1987). These factors are not "a finely tuned formula" to be "mechanically applied," but rather are "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id.; see also id. at 300 ("[T]he central component of this inquiry [is] whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." (internal quotation marks and citations omitted)).

While the curtilage doctrine has largely been developed and applied in the context of rural, single-family homes, see, e.g., Dunn, 480 U.S. at 297-303, the home in question in this case is in a multi-unit structure. Multi-unit structures, in contrast to such single-family homes, are more likely to have certain shared spaces. Accordingly, "[i]n a modern urban multifamily apartment house, the area within the 'curtilage' is necessarily much more limited than in the case of a rural dwelling subject to one owner's control." Cruz-Pagan, 537 F.2d at 558 (quoting Commonwealth v. Thomas, 267 N.E.2d 489, 491 (Mass. 1971)). This does not mean that the concept of curtilage does not, or should not, have any applicability in the apartment context. See, e.g., United States v. Jackson, 728 F.3d 367, 374 (4th Cir. 2013) (concluding that apartment's curtilage extended to its private back patio but not the shared yard); see also Espinoza v. State, 454 S.E.2d 765, 767 (Ga. 1995) ("Like residents in single-family homes, apartment residents have a reasonable expectation of privacy in the curtilage surrounding their apartment.").

A number of persuasive considerations weigh in favor of applying the concept of curtilage in the apartment context generally and in this case in particular. "[W]hen it comes to the Fourth Amendment, the home is first among equals." Jardines, 133 S. Ct. at 1414. "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Id. (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)). Meaningful protection for the sanctity and intimacies of the home requires that the area immediately surrounding the home enjoy a heightened degree of protection. See id. ("This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside his front window."). This is so regardless of whether the home is a freestanding dwelling or an apartment. Thus, meaningful protection for the sanctity of a person's home requires the recognition of curtilage, at least to some extent, in the apartment context. See Fixel v. Wainwright, 492 F.2d 480, 484 (5th Cir. 1974) ("Contemporary concepts of living such as multi-unit dwellings must not dilute [an individual's] right to privacy any more than is absolutely required."); see also United States v. Roby, 122 F.3d 1120, 1127 (8th Cir. 1997) (Heaney, J. dissenting) ("I do not believe that the Fourth Amendment protects only those persons who can afford to live in a single family residence with no surrounding common space.").

Moreover, the area immediately surrounding the home is "linked to the home, both physically and psychologically," Jardines, 133 S. Ct. at 1415, whether the home is an apartment or freestanding dwelling. Residents of freestanding dwellings and apartments alike would feel a similar sense of invasion upon sitting in their homes and seeing their door knobs turn or witnessing police peer through the transom above their door. The Supreme Court has indicated

that the concept defining curtilage is "easily understood from our daily experience."  Id. (quoting

Oliver, 466 U.S. at 182 n.12).  Daily experience counsels that apartment dwellers do not expect

police officers to engage in such measures inches from or touching their homes.  See, e.g.,

McDonald v. United States, 335 U.S. 451, 456 (1948) (holding that officers' actions of climbing

through a window of a boarding house, standing on a chair in the hallway, and peering through

the transom above the defendant's door constituted an unlawful search); United States v.

Charles, 290 F. Supp. 2d 610, 614 (D.V.I. 1999) (holding that warrantless swipe of residue from

doorknob of home violated defendant's Fourth Amendment rights for "[c]learly, the doorknob on

the defendant's front door . . . is within the curtilage of the home."); see also 1 W. LaFave,

Search and Seizure § 2.3(c) (5th ed.) ("To assert that the tenant in a[n] . . . apartment building

has an expectation of privacy in his space is to say very little if the tenant is put to the choice of

papering over his transom and stuffing his keyhole or else having a policeman look in.").

Turning to the particular area at issue in this case, several of the Dunn factors favor

finding that the area surrounding the door to Apartment D falls within the curtilage of the home.

First, this area is in immediate proximity to the home, as close to the home as the front porch in

Jardines.  Second, although there is no enclosure specific to Apartment D, the area in question

stands within a larger enclosure—the locked exterior of the building.  Third, the pictures

provided by defense counsel suggest that the tenants might have used this area as an extension of

the home similar to a front porch.  See Jardines, 133 S. Ct. at 1415 ("The front porch is the

classic exemplar of an area adjacent to the home and 'to which the activity of home life

extends.'" (quoting Oliver, 466 U.S. at 182 n.12)).  Fourth, residents took steps to protect the

area from the general public, by keeping the outer door to 131 Laurel Street locked.  See United

States v. Blank, 251 F. Supp. 166, 173 (N.D. Ohio 1966) ("The lock on the door protects the

tenants against the prowler and the pervert, the vandal and the vigilante, the unsolicited solicitor and the unwanted waresman. . . .   The lock means simply that the public may not enter . . . .”). Moreover, access by outsiders was further limited by having mail and apartment buzzers on the outside of the building,

In the present case, the officers stood at the threshold of the door to Apartment D, an area in which the tenant would not expect others to be present except for the limited purpose of knocking.  While the tenant would expect others to pass by on route to the neighboring unit, the tenant likely would not expect others to do so inches from or touching his or her door.   See United States v. Burston, No. CR12-0042, 2014 WL 4364468, at *3-4 (N.D. Iowa July 10, 2014) (finding that area six inches from apartment’s window fell within the curtilage of the home, reasoning that “certainly the area as close as six inches from Burston’s window would be an area that Burston would not expect others to occupy”); see also State v. Ortiz, 600 N.W.2d 805, 819 (Neb. 1999) (agreeing that the Fourth Amendment affords “some measure of privacy at the threshold of an apartment dwelling”).

Although many of the considerations discussed above weigh in favor of finding curtilage in this case, this court does not write on a blank slate.  In Cruz-Pagan, 537 F.2d at 558, the First Circuit held that a common garage of a multi-unit apartment house did not constitute curtilage. Significantly, in doing so, the First Circuit reasoned that “[i]n a modern urban multifamily apartment house, . . . a tenant’s ‘dwelling’ cannot reasonably be said to extend beyond his own apartment and perhaps *any separate areas subject to his exclusive control*.”  Id. (quoting Thomas, 267 N.E.2d at 491) (emphasis added).

Here, the area at the threshold of the door to Apartment D cannot be classified as a “separate area[] subject to [the tenant’s] exclusive control.”  Cruz-Pagan, 537 F.2d at 558.  The

second-floor landing is shared by the two second-floor units as well as accessible to the tenants

of three apartment units and their guests, the landlord, and the landlord's agents. Moreover, the

area in front of the door to Apartment D serves as a passageway for egress and ingress to the

neighboring apartment unit. Thus, the tenant of Apartment D could not exclude others from or

control access to this space. Bound by the First Circuit's reasoning in Cruz-Pagan, this court

concludes that the area in front of the door to Apartment D was not a "separate area[] subject to

[the tenant's] exclusive control" and thus does not constitute curtilage. See id.

Bain points to a further physical intrusion in inserting the key into the door lock. At this

point, the officers were no longer simply intruding in the common area of the apartment

building. At this juncture, the physical invasion was of the home itself. See Silverman v. United

States, 365 U.S. 505, 512 (1961) (holding that officers' insertion of electronic instrument from

adjacent vacant row house through common wall to heating duct constituted a physical intrusion

of the home in violation of the Fourth Amendment); Kyllo v. United States, 533 U.S. 27, 37

(2001) ("In Silverman . . . we made clear that any physical invasion of the structure of the home,

'by even a fraction of an inch,' was too much."); Clinton v. Virginia, 377 U.S. 158 (1964)

(reversing state court's holding that insertion of electronic device into the wall dividing two

apartments did not constitute a physical intrusion of the home); see also Concepcion, 942 F.2d at

1179 (holding that insertion of key into lock of apartment door constituted a search); United

States v. Flores-Lopez, 670 F.3d 803, 807 (7th Cir. 2012) (asserting that "any doubts" about

Concepcion's holding that testing a key in a lock is a search "have been scotched" by Jones).

Prior to the Supreme Court's decision in Jardines and Jones, the First Circuit considered

whether testing a key in the lock to a storage compartment constituted a search. Applying the

Katz reasonable-expectation-of-privacy test, the court found that turning the key in the storage

unit padlock, "did not constitute a search, or at least, not an unreasonable search protected by the Fourth Amendment" because there is no expectation of privacy involved.  United States v. Lyons, 489 F.2d 210, 212-13 (1st Cir. 1990); see also Hawkins, 139 F.3d at 33 n.1 ("[I]nsertion of a key into the lock of a storage compartment for purposes of identifying ownership does not constitute a search for purposes of the Fourth Amendment." (citing Lyons, 898 F.2d at 212-13)). In light of Jones and Jardines, the Katz formulation relied on in Lyons does not limit Fourth Amendment protections but expands them.  Thus, this court concludes that the physical intrusion of the key into the structure of the home in order to obtain information in this case gives rise to a Fourth Amendment violation.  See Payton v. New York, 445 U.S. 573, 586 (1980) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home are presumptively unreasonable."); see also Arizona v. Hicks, 480 U.S. 321, 325 (1987) ("A search is a search, even if it happens to disclose nothing but the bottom of a turntable."); Kyllo, 533 U.S. at 37 ("The Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained. . . .  In the home, our cases show, *all* details are intimate details . . . .").

Although the court finds that the turning of the key in the lock to Apartment D was unconstitutional, it does not find that the exclusionary remedy sought by Bain to be available here.  The agents here conducted themselves in reasonable reliance on Lyons and Hawkins.  See Davis v. United States, 131 S. Ct. 2419, 2434 (2011) (holding that the good faith exception to the exclusionary rule applies where police conduct a search in reasonable reliance on binding appellate precedent); see also United States v. Echevarria-Rios, 746 F.3d 39, 41 (1st Cir. 2014) ("Even assuming the evidence was seized in violation of the Fourth Amendment, the evidence will be suppressed only when the police conduct is 'sufficiently deliberate that exclusion can

meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" (quoting <u>Herring v. United States</u>, 555 U.S. 135, 144 (2009))).  Although both <u>Jones</u> and <u>Jardines</u> had issued at the time of the search, the First Circuit has not yet weighed in on how these cases (involving GPS tracking of a car and the use of trained police dogs to sniff the curtilage of a home) impact the analysis of a lock in the door of an apartment.  Accordingly, the agents reasonably relied on <u>Lyons</u> and <u>Hawkins</u> in conducting the search in this case, and exclusion of the evidence obtained as a result of the search is not warranted.

### d. The Officers' Entry into Apartment D

Bain next contends that the officers' warrantless entry into Apartment D following his arrest was unlawful because there were no exigent circumstances justifying the search.  The Government responds that the officers' entry was justified in order to maintain the "status quo" and prevent the destruction of evidence until a search warrant arrived.[4]

"It is a well-established principle of Fourth Amendment law that warrantless searches inside a home are presumptively unreasonable."  <u>United States v. Samboy</u>, 433 F.3d 154, 158 (1st Cir. 2005).  "Nevertheless, a warrantless entry into a person's dwelling may be permitted if 'exigent circumstances' arise."  <u>Id.</u>  "The government bears the burden of proving exigent circumstances."  <u>Id.</u>  "To show exigent circumstances, the police must reasonably believe that 'there is such a compelling necessity for immediate action as will not brook the delay of

---

[4] In a footnote of its opposition, the Government clarified that it does not seek to justify the warrantless search as a "protective sweep" because the officers "arrested the defendant outside the Target Premises and did not have specific information that the defendant had any armed, violent, or dangerous accomplices inside."  Govt. Opp'n 15 n.5 [#45]; <u>see</u> <u>United States v. Martins</u>, 413 F.3d 139, 149 (1st Cir. 2005) ("The baseline rule is that police officers, in conjunction with an arrest on residential premises, may undertake a protective sweep so long as they can point to 'articulable facts which, taken together with the rational inferences from those facts,' would warrant a reasonably prudent officer in believing 'that the area harbor[s] an individual posing a danger.'" (quoting <u>Maryland v. Buie</u>, 494 U.S. 325, 327 (1990))).

obtaining a warrant.'"  Id. (quoting Fletcher v. Town of Clinton, 196 F.3d 41, 49 (1st Cir. 1999));

see also Kentucky v. King, 131 S. Ct. 1849, 1863 (2011) ("Any warrantless entry based on

exigent circumstances must, of course, be supported by a genuine exigency.").  "Proof of exigent

circumstances 'should be supported by particularized, case-specific facts, not simply generalized

suppositions about the behavior of a particular class of criminal suspects.'"  Samboy, 433 F.3d at

158 (quoting United States v. Hidalgo, 747 F. Supp. 818, 828 (D. Mass. 1990)).

One commonly-recognized exigent circumstance is the "threatened destruction of

evidence inside a residence before a warrant can be obtained."  United States v. Martins, 413

F.3d 139, 146 (1st Cir. 2005); United States v. St. Pierre, 488 F.3d 76, 79 (1st Cir. 2007) ("Such

exigent circumstances arise when, *inter alia*, the police have a reasonable fear that a person

would destroy drug evidence unless the person's premises are secured.").  "Officers are justified

in relying on this exception only if they show an objectively reasonable basis for concluding that

the loss or destruction of evidence is likely to occur."  Samboy, 433 F.3d at 158.

In this case, the Government has not met its burden to show that the officers had an

objectively reasonable basis for concluding that the loss or destruction of evidence was likely to

occur inside Apartment D.  At the time the search, the officers did not have any information

suggesting that anyone was present inside the apartment.  Bain was in custody and on his way to

the hospital, and there was no indication Bain was working with others as part of his drug-

dealing activities who could have been inside the apartment and who posed a threat to evidence.

Based on the record in this case, the court finds that the Government has not met its burden of

demonstrating exigent circumstances justifying the warrantless search.

Bain requests that the court excise from the warrant affidavit the information obtained as

a result of the unlawful search of Apartment D—specifically, the officers' observations that the

apartment contained a parking ticket for Bain's Cadillac, a safe being used as a television stand, and mail addressed to 131 Laurel Street, Apartment D—in assessing probable cause to support issuance of the search warrant.  See Mot. Suppress 9 [#36].  The court will do so and now turns to the issue of probable cause.

### e.  *Probable Cause to Support Issuance of the Search Warrant*

Bain contends that the search warrant affidavit fails to establish probable cause to believe that evidence of his alleged drug dealing would be found in 131 Laurel Street, Apartment D.  In particular, Bain asserts that the affidavit fails to establish that the apartment was his residence.  Bain further asserts that even if the affidavit supports an inference that the apartment was his residence, the affidavit nevertheless fails to establish a nexus between the apartment and his alleged drug-dealing activities.

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched—the so-called 'nexus' element."  United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999).  "With regard to the 'nexus' element, the task of a magistrate in determining whether probable cause exists is 'to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  Id. (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  To establish probable cause, "the facts presented to the magistrate need only 'warrant a man of reasonable caution' to believe that evidence of a crime will be found."  Id. (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)).  "The probable cause standard 'does not demand showing that such a belief be correct or more likely true than false.'"  Id. (quoting Brown, 460 U.S. at 742).

"The nexus between the objects to be seized and the premises searched need not, and often will not, rest on direct observation." Feliz, 182 F.3d at 88. Rather, in certain circumstances, the nexus between the objects to be seized and the location to be searched "can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime] . . . ." Id. (quoting United States v. Charest, 602 F.2d 1015, 1017 (1st Cir. 1979)).

"The First Circuit of Appeals has held that probable cause to suspect that someone has committed a crime does not automatically give rise to probable cause to search that person's home." United States v. Thompson, 630 F. Supp. 2d 138, 143 (D. Mass. 2009); Feliz, 182 F.3d at 88 ("[W]e do not suggest that, in all criminal cases, there will automatically be probable cause to search a suspect's residence."). Nevertheless, "interpreting a search warrant affidavit in the proper 'commonsense and realistic fashion' may result in the inference of probable cause to believe that criminal objects are located in a particular place, such as a suspect's residence, to which they have not been tied by direct evidence." Feliz, 182 F.3d at 88 (citations omitted). For instance, "[w]here there is evidence that a defendant is an established and successful drug trafficker engaged in an ongoing distribution scheme, an inference may be drawn that he is likely to keep drugs and business records in his home." United States v. Eng, 571 F. Supp. 2d 239, 248-49 (D. Mass. 2008) (citing Feliz, 182 F.3d at 87-88).

In upholding searches of the homes of suspected drug traffickers, the First Circuit has considered factors such as: (1) a law enforcement officer's statement, drawn from training and experience, that drug traffickers often maintain cash and records associated with their trafficking in their homes, see Feliz, 182 F.3d at 87; United States v. Ribeiro, 397 F.3d 43, 50-51 (1st Cir. 2005); (2) evidence that the suspect was a large-scale or long-time drug trafficker, and thus

required a "safe yet accessible place" to store cash and records, see Feliz, 182 F.3d at 87-88; and (3) evidence that the suspect traveled directly between the home and the site of the drug transaction, see Ribeiro, 397 F.3d at 50; United States v. Barnes, 492 F.3d 33, 37 (1st Cir. 2007) ("This court has repeatedly found . . that when a defendant sells drugs outside his home, it is reasonable to conclude that there is evidence of his drug dealing activity in the home, particularly when the defendant is observed leaving the home immediately prior to selling drugs.").

Here, Agent Connerney provided the following information in support of his belief that Bain was residing at 131 Laurel Street, Apartment D at the time of the warrant application. First, the affidavit includes evidence Bain had recently moved out of his brother's apartment at 685 Moody Street after being released on charges of assaulting his brother. Second, the affidavit states that after Bain's release, officers observed Bain's car parked near 131 Laurel Street "on several occasions," including "late at night" and in the morning. In particular, the affidavit indicates that officers observed Bain's Cadillac parked near 131 Laurel Street at 2:35 p.m. on March 28, 2014, at 12:30 a.m. on March 29, 2014, and at 9:00 a.m. on April 1, 2014. Third, the affidavit states that officers observed Bain entering and exiting 131 Laurel Street, including entering at 2:35 p.m. on March 28, 2014, and exiting at 9:00 a.m. on April 1, 2014. Fourth, and most significantly, the affidavit indicates that officers found keys to 131 Laurel Street, Apartment D on Bain's person. Although the above evidence does not provide conclusive proof that Bain was living at 131 Laurel Street, Apartment D at the time of the warrant application, conclusive proof is not necessary for probable cause. Rather, a common-sense inference from the above facts—particularly Bain's possession of key to the apartment and the presence of Bain's car parked near the apartment late at night and in the morning—is that, after Bain moved out of his brother's home, Bain was staying at 131 Laurel Street, Apartment D.

The affidavit includes additional facts—beyond the facts suggesting that Bain was staying at 131 Laurel Street, Apartment D—to strengthen the inference that evidence of Bain's drug dealing would be found at the apartment. First, the affidavit indicates that Bain arranged for the second controlled buy to take place within a few blocks of 131 Laurel Street, and that officers observed Bain approach the buy on foot. Although the affidavit does not state whether or not Bain traveled directly from the apartment to the transaction, the close proximity to between the apartment and the transaction suggests that Bain might have been using the apartment in connection with his dealing activities. See United States v. Singleton, 125 F.3d 1097, 1102 (7th Cir. 1997) (probable cause where an informant "bought cocaine in the vicinity of the Edgewood residence on two separate occasions"); Holmes v. State, 796 A.2d 90, 101 (Md. 2002) (reasoning that the drug transaction "occurred less than a block from petitioner's home").[5] Second, the affidavit indicates that on April 1, 2014, at 9:00 a.m., after Bain exited 131 Laurel Street and officers approached Bain to place him under arrest, Bain swallowed something that the officers believed to be drugs. A reasonable inference from these facts is that Bain had swallowed contraband and had brought the contraband with him out of 131 Laurel Street. See United States v. Hobbs, 509 F.3d 353, 362 (7th Cir. 2007) (probable cause where defendant "was caught carrying a substantial amount of cocaine immediately after leaving his house").

Finally, the affidavit provided evidence that Bain was a long-time drug dealer who was

---

[5] In fact, Bain arranged for both controlled buys to take place in close proximity to apartments in which he was believed to be staying at the time. As to the first controlled buy, Bain arranged for CW-1 to meet him outside of his brother's apartment complex at 685 Moody Street, where Bain was living at the time. Officers then observed Bain exit the apartment building, walk towards CW-1's car, and complete the sale. As to the second controlled buy, Bain arranged to meet CW-1 on Waite Street, a few blocks from 131 Laurel Street. Officers then observed Bain approach Waite Street on foot, enter CW-1's car, and complete the sale. The close proximity between the buys and the apartments in both cases suggests that Bain might have been operating out of the apartments in which he was staying.

engaged in ongoing drug-dealing activity. In particular, the affidavit describes Bain's three prior convictions for drug-trafficking offenses and two recent controlled buys. In light of this evidence, it is reasonable suppose that Bain maintained cash, records, and other evidence related to his dealing in some "safe yet accessible place." See Feliz, 182 F.3d at 87-88 ("It could reasonable be supposed that a regular trafficker . . . possessed documents showing the names and telephone numbers of customers and suppliers . . . [and] money he collected and used in his business in some safe yet accessible place."). It is further reasonable to suppose that Bain kept such items at 131 Laurel Street, Apartment D—an apartment (1) to which Bain had a key, (2) where Bain appeared to be staying at the time, (3) located a few blocks from the second controlled buy, and (4) from which officers reasonably believed Bain to have brought contraband while exiting the apartment on April 1, 2014, at 9:00 a.m., the day of the search. See, e.g., United States v. Grossman, 400 F.3d 212, 218 (4th Cir. 2005) ("Under these circumstances, it is reasonable to suppose that a drug dealer stores drugs in a home to which he owns a key."); Ribeiro, 397 F.3d at 50 ("[I]n the case of drug dealers evidence is likely to be found where the dealers live." (quoting United States v. McClellan, 165 F.3d 535, 546 (7th Cir. 1999))). This inference is further strengthened by Agent Connerney's observation, based on his training and experience, that drug dealers typically store cash, documents, and other drug-related evidence where they reside. See Feliz, 182 F.3d at 87 (reasoning that courts are "entitled to accord some weight" to a law enforcement officer's observations drawn from training and experience).

Although this is a close case, the court concludes that the circumstances set forth in the affidavit—taken together with the reasonable and common-sense inferences from those circumstances—establish a fair probability that evidence of Bain's drug dealing would be found

at 131 Laurel Street, Apartment D.[6]

IV.    Conclusion

For the above-stated reasons, the court hereby orders that Bain's <u>Motion to Suppress Evidence</u> [#36] is DENIED.

IT IS SO ORDERED.

/s/ Indira Talwani
United States District Judge

Date:  February 17, 2015

---

[6] Because the court finds that the search warrant was supported by probable cause, the court need not reach the Government's alternative argument that the officers' execution of the warrant falls within the good-faith exception to the exclusionary rule under <u>United States v. Leon</u>, 468 U.S. 897, 923 (1984), because the warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."